[Cite as *Bashale v. Quaicoe*, 2013-Ohio-3101.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| PAULINE BANKESHA BASHALE | : | JUDGES: |
| | : | |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellant | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| -vs- | : | |
| | : | |
| FRANCIS B. QUAICOE | : | Case No. 12 CAF 10 0075 |
| | : | |
| | : | |
| Defendant - Appellee | : | O P I N I O N |

CHARACTER OF PROCEEDING:    Appeal from the Delaware County
Court of Common Pleas, Juvenile
Division, Case No. 10-03-0076AD

JUDGMENT:    Affirmed

DATE OF JUDGMENT:    July 12, 2013

APPEARANCES:

For Plaintiff-Appellant    For Defendant-Appellee

PAMELLA A. LAMMON    Francis Quaicoe
Attorney at Law    7520 Cook Road, Apt. 1606
103 North Union Street, Suite D    Houston, TX 77072
Delaware, OH 43015

CELESTE MANNS-BRAMMER
Guardian ad Litem
P.O. Box 2451
Westerville, OH 43086

*Baldwin, J.*

{¶1}    Plaintiff-appellant Pauline Bankesha Bashale appeals from the October 3, 2012 Judgment Entry of the Delaware County Court of Common Pleas, Juvenile Division, designating defendant-appellee Francis B. Quaicoe custodian and residential parent of the parties' minor child.

## STATEMENT OF THE FACTS AND CASE

{¶2}    Appellant Pauline B. Bashale and appellee Francis B. Quaicoe are the parents of Masolean Esther Quaicoe (DOB 11/11/05) (hereinafter "Esther"). On March 25, 2010, appellant filed a complaint for the allocation of parental rights and responsibilities, seeking to be designated Esther's custodial and residential parent. Attached to the complaint was a copy of an original petition for divorce that appellee had filed against appellant on February 2, 2010 in Texas.

{¶3}    Appellant, on March 26, 2010, filed a motion for emergency temporary orders, seeking emergency temporary custody of Esther. Appellant, in her motion, alleged that at the end of January of 2010, appellee had taken Esther to Texas without her knowledge and consent and had not allowed her to have contact with Esther. Pursuant to a Magistrate's Decision filed on April 8, 2010 and approved and adopted by the court, the court found that the Delaware County Court of Common Pleas, Juvenile Division, had jurisdiction over Esther and granted appellant temporary emergency custody. The court further ordered that Esther be immediately returned to appellant's physical custody of her. A hearing was scheduled for April 20, 2010.

{¶4}    Neither appellee nor counsel on his behalf appeared at the April 20, 2010 emergency hearing before the Magistrate. The Magistrate, in her April 26, 2010 decision

that was approved and adopted by the trial court, indicated that appellant's counsel had informed the court that appellant had been unable to gain physical custody of Esther, despite having traveled to Texas. The court once again granted appellant temporary emergency custody of Esther and ordered that she be immediately returned to Ohio.

{¶5} Appellee, on May 7, 2010, filed an answer to the complaint. On May 10, 2010, the court held a continuation of the emergency hearing at which both appellant and appellee appeared along with appellant's counsel. The Magistrate, in her May 18, 2010 decision which was approved and adopted by the trial court, found that appellant had regained custody of Esther on May 9, 2010 and designated appellant her temporary legal custodian and residential parent. The court also appointed a Guardian ad Litem.

{¶6} On February 13, 2012, the Guardian ad Litem filed her report and recommendation. The Guardian ad Litem, in her report, recommended that custody of Esther be granted to appellant and that appellee be granted long distance visitation. The Guardian ad Litem indicated that she was not sure that appellee had the capacity to care for Esther because his job required travel and that appellee "goes back and forth on this issue of if he could be custodian or not." The Guardian ad Litem, in a subsequent report and recommendation filed on July 23, 2012, recommended that appellee have custody and that appellant be granted long distance visitation. The Guardian ad Litem indicated that she believed that appellee would ensure that the child had a relationship with both parents and would make sure that the child had a "good school career."

{¶7}   A trial on appellant's complaint for the allocation of parental rights and responsibilities was held on July 30, 2012. At the time of the trial, the parties were still married.

{¶8}   At the trial, Amy West testified that she was appellant's former neighbor and that the two became friends.  She testified that she had known appellant and Esther for approximately one year and that Esther was in her Girl Scout Group. West testified that she had worked as a Court Appointed Special Advocate for 10 to 11 years before quitting about two years earlier. West, who has four children of her own and a stepson, testified that when appellant lived near her, she saw appellant and Esther around a couple of times a week. She testified that since appellant moved in April or May of 2012, she saw appellant and Esther about once a week. West also saw Esther independently due to her work as a substitute teacher and the leader of a Girl Scout Troop. According to West, appellant was a good mother and never yelled or was mean to her daughter. West indicated that appellant was very loving and caring  and that Esther  was always clean and well-behaved.  West further testified that Esther had developed friendships with other girls in the Girl Scout Troop.

{¶9}   West testified that she had been over to appellant's apartment and that it was nice, clean and in a nice neighborhood.  She indicated that Esther had her own room in the apartment. When asked, West testified that she had never heard appellant speak negatively about appellee and had never heard Esther say anything negative about him.  West further testified that the Delaware City Schools kindergarten schedule was confusing because it changed every week. She stated that she had no concerns about appellant being designated Esther's custodial parent.

{¶10}   On cross-examination, West testified that appellant had five children and that she was aware that appellant had changed residences three (3) times in one year. West stated that she knew that appellant's son, Matthew, did not attend school regularly.   Esther, according to West, was late for Girl Scout meetings. Esther was usually taken to the meetings by either appellant or Matthew.   West also testified that Esther was social and made friends easily.

{¶11}   At the trial, appellant testified that she lived in Delaware, Ohio and was still married to appellee and had been since 2003. She testified that appellee left for good in 2008 and was currently residing in Houston, Texas.   Appellant testified that after appellee left in 2008, the marital home was foreclosed on.   According to appellant, Esther, who was born in Ohio, stayed with her after the parties separated.   Appellant indicated that she did not believe that appellee, who was born in Ghana, had any family in the United States.   She further testified that appellee had five children in London and was a citizen of Ghana and the UK.

{¶12}   Appellant testified that she was born in Burundi and was a United States citizen. She has been in the United States since 1994 and testified that she was recently hired as a substitute teacher in a school where she will initially earn $11.50 an hour. After three months, her salary will be increased to $12.50 an hour for a forty hour week. Appellant testified that she would be working from 7:30 a.m. to 3:00 p.m. Monday through Friday.   She testified that she intended to drop Esther  off at the SAC program at 7:00 a.m. on school days and that after school, Esther would go back to SAC until appellant picked her up around 4:00 p.m. Appellant testified that she believed that cost for SAC would be  $280.00 per month.

{¶13}   Previously, appellant had worked about 40 hours a week at Arbors of Delaware where she earned $11.05 an hour and received a one dollar an hour shift differential.  She testified that she was paid every two weeks and that her gross pay for June 25, 2012 was $460.92.  During the June 11, 2012 pay period, appellant earned $1,685.15.  Appellant was terminated from such job on or about June 24, 2012.

{¶14}   When asked, appellant testified that she was not paying or receiving any spousal or child support. She does not have any additional minor children in her household. According to appellant, she has been residing at her current address, an apartment,  since March of 2012 and her lease was scheduled to expire in March of 2013. She testified that Esther had her own bedroom in the apartment, that the neighborhood was quiet and safe and that Esther had made friends at the apartment complex. Matthew, appellant's son, also lived there. She testified that appellee had evicted her from the marital home, which was foreclosed on, and that she then moved to Virginia to be with family. Appellant testified that she stayed in Virginia for about a month before returning to Ohio because Matthew refused to go to Virginia.

{¶15}   Appellant, upon her return to Ohio, struggled for awhile. She testified that appellee sent her $200.00 in July of 2012, but that he did not send her money on a regular basis to make sure that Esther was taken care of.  According to appellant, both her health and Esther's health was good and she had a good relationship with Esther. Appellant indicated that she was a good mother who was involved with her daughter and her daughter's schooling.  Appellant admitted that Esther had attendance problems during her kindergarten year. She testified that such problems were due to confusion over which school Esther was supposed to attend  and the school schedule as well as

car issues and sickness. Appellant indicated that the attendance issues had been remedied. She further testified that she was the primary caregiver when she was still with appellee and also since their separation and that appellee had not seen Esther on a consistent basis since they separated in 2008. Appellant testified that in 2010, appellee came and got Esther when appellant was not present and took her to Texas for three months. Appellant testified that she went out to Texas three times to get Esther until she finally got her back. She further testified that when she got Esther back, Esther's lips were cracked, she looked dehydrated and her hair was not cared for and she was skinny. Appellant took Esther to the doctor and for counseling. She testified that appellee did not talk to Esther much unless there was a court date.

{¶16} During the trial, appellant testified that appellee had threatened to take Esther to Ghana. She testified that appellee did not exercise his two weeks visitation in July of 2012. Appellant testified that she should be granted custody because she had been with Esther since Esther was born, with the exception of the time when appellee took Esther to Texas for three months. She stressed that she was a good mother. Appellant voiced concerns that appellee traveled and worked a lot and also testified that Gigi, her daughter and appellee's stepdaughter, said that appellee had molested her.

{¶17} Appellant testified that Esther was involved in Girl Scouts, dance and church activities and that she herself was taking college classes online at the cost of $11,000.00 a year in order to get a Master's in Public Health. Appellant took out loans to pay for the degree and testified that the program would take a year and a half. Appellant had started taking the classes two months earlier. Appellant testified that she also is

completing an internship that takes approximately 36 hours a year, or a total of 72 hours.

{¶18} On cross-examination, appellant testified that she was starting her new job on August 7, 2012 and that she would be working approximately 35 minutes away. She admitted that it was fair to say that she had significantly increased her travel costs to take such job. Appellant admitted that her son, Matthew, had significant problems with attendance and being tardy while he was in high school. Matthew's attendance records were admitted as a stipulated exhibit. During his senior year, he had 62 days when he was either tardy, unexcused or absent. Matthew also had serious attendance and tardiness issues during his 10th and 11th grade years. Appellant also admitted that her daughter Angela missed 32 days while in the 12th grade and was late 24 times during her senior year and had attendance and/or tardiness issues during her junior year. In addition, during her kindergarten year, Esther, who only went to school five out of every ten days, was unexcused tardy 23 times. Appellant admitted that she had taken Esther to school on a day when she was not scheduled to be there.

{¶19} Appellant also admitted that, at times, her phone was not able to take messages and also admitted that the Guardian ad Litem had mentioned to her that she was having a hard time getting hold of appellant because her voice mailbox was full. She testified that she had told appellee to text her. Appellant also testified that she had a falling out with her daughter, Gigi, after high school because she thought Gigi was a witch since she was involved in Wicca. When asked, appellant testified that Gigi was lying if she testified that appellee had never molested her. The allegation of abuse was not substantiated by Job and Family Services. Appellant admitted that she missed her

daughter Angela's high school graduation because she was in Virginia and did not have the money to go.

{¶20} On cross-examination, appellant also admitted that Children's Services had been involved with her family voluntarily on and off for the last three years after numerous calls were made to the police regarding the unruly behavior of Matthew, Angela and Gigi. Matthew often took appellant's car without her permission. At times when she was working the night shift, appellant would leave Matthew in charge of Esther. Appellant also testified that she was an hour or so late for a meeting in November of 2011 between the Juvenile Court staff and Esther's school about Esther's attendance and that, as a result, the meeting did not take place. She admitted that she had no family keeping her in Delaware County and that Esther's school sometimes had difficulty getting hold of her.

{¶21} On redirect, appellant testified that sometimes she prevented Esther from seeing her older siblings because they used to smoke around Esther.

{¶22} The next witness to testify was Bembeleza Bengaia, who is known as Gigi and is appellant's daughter and appellee' stepdaughter who was attending Wright State University. Gigi testified that her attendance varied when she was in high school because she was sick and that the family got letters from the Juvenile Court about her attendance. Gigi testified that she got along pretty well with her stepfather when she was in high school and that he was a good stepfather and that he brought everyone together. She testified that appellant talked negatively about Gigi's biological father, who was divorced from appellant when Gigi was 10 or 11, and that, as a result, Gigi was not able to maintain a relationship with him until recently.

{¶23}   Gigi testified that her relationship with appellant was not good and that appellant had called her a witch because Gigi liked wearing black clothing and listening to rock music. Gigi, who denied being involved in witchcraft, testified that appellant does not allow her to see Esther.  According to Gigi, appellee arranged for her to spend some time with Esther the past summer.  She further testified that she sometimes saw Esther when Matthew was with Esther. Gigi also tested that appellant at times had left Matthew and Angela, who were underage at the time, alone for about a week with Esther.  In 2011, Gigi and Angela stayed with appellee for the summer after Angela, during the end of her senior year in high school, had a falling out with appellant.

{¶24}   Gigi testified that all of her siblings had serious attendance problems and that appellee valued education. She testified that appellee, when they lived together, told her to make sure that she finished school and that appellee helped her financially. She testified that she felt more comfortable calling appellee than appellant if she needed something.  Gigi had been to appellee's place in Texas for the summer and testified that it was nice and would be a good place for Esther to live. Gigi denied that appellee had ever molested her and denied telling appellant that he did.

{¶25}   On cross-examination, Gigi admitted that she had Esther the previous week when appellee was supposed to have parenting time with her. She testified that appellee arrived in Ohio on the 28th of July of 2012 and that he got Esther from her on such date.  She further testified that while she was staying with appellee in Texas in 2011, she observed him trying to contact appellant and Esther on the phone. When he was able to do so, the parties argued and Esther was crying.  When asked, Gigi testified that she witnessed appellee being frustrated in his attempts to contact Esther and that

she felt that appellant stood in the way of appellee being able to talk to Esther. Gigi further testified that she sometimes had problems getting hold of appellant by phone. She indicated that she believed that Esther, if she had to relocate to another place, would manage to do okay in school and make friends and that appellee would allow Esther to talk to appellant over the phone and to have more visitation and contact with Esther. Gigi believed that appellee had Esther's best interests at heart and was a hard worker. She also testified that appellant, at one point, disowned her and her sister, Maggie, for about a year. Gigi further testified that she believed that Esther should be in the custody of both parties.

{¶26} Appellee also testified at the trial. He testified that he was residing in Houston, Texas in a two bedroom apartment. Appellee testified that he drove a cab as an independent contractor and also did moving and hauling and that he worked from 7:00 a.m. to 6:00 p.m. He testified that he was born in Ghana and completed his college education there before moving to London. Appellee testified that he had British citizenship and was in the United States on a green card that expired in 2015 and was renewable.

{¶27} Appellee voiced concerns that Esther would have attendance issues like her siblings if she resided with appellant and stated that he would make sure that Esther attended school regularly and on time. He testified that he has an Associate Degree in electronic engineering and that his attendance and grades when he was in school were very good. Appellee also indicated that he was worried that if Esther was with appellant, she would not be able to see and interact with her siblings. He testified that he had arranged for Esther to spend time with Gigi and Angela during the summer of 2012

during the first part of his scheduled summer companionship. According to appellee, at times he has had difficulty contacting appellant because her phone number is either busy or not working or appellant would not call him back after he left a message. He also testified that he had trouble scheduling parenting time with Esther because appellant could not agree on anything.

{¶28}   Appellee testified that if he was granted custody of Esther, he would allow appellant to see and talk to her. He testified that if he had Esther, his daycare costs would be $100.00 to $120.00.  When asked, appellee testified that he had provided appellant with financial assistance various times since the parties' separation, but that appellant changed her mind with respect to how she wanted the money sent. He testified that he took Esther to Houston in 2010 because he was concerned about the state that she was in. He testified that Esther, who was wearing underclothes,  did not have any clothing and did not know where her clothing was and that she was sick when he took Esther back to her mother after her visit. Appellee testified that he got an antibiotic for her.

{¶29}   Appellee further testified that he sent his stepdaughter, Angela, money for her graduation cap and gown. Appellee also testified that he believed that discipline was important and that parents had to agree on the type of discipline.  He stated that he never had to discipline Esther and that, when they were together, they played games and engaged in educational activities.  Appellee denied that he served an eviction notice on appellant to vacate the marital residence, which was a rental home, but knew that she would have to do so because the foreclosure was coming. According to appellee, he gave appellant $800.00 for a deposit on an apartment.

{¶30}   Appellee indicated that he got along well with his stepchildren and that he loved them and helped them. He denied ever molesting Gigi.

{¶31}   On cross-examination, appellee testified that he had been a British citizen for 15 or 16 years and had not thought about becoming a U.S. citizen. He indicated that the fact that Esther was a U.S. citizen was a good reason to become one himself. He testified that he had not been in Great Britain since approximately 2001 and had a 13 year old son there who he had not seen since 2004 or 2005.  The two Skype each other. He testified he was fine if the court ordered that he could not take Esther out of the country without appellant's approval. Appellee also testified that he has no family in Texas and that he moved there for job purposes. Appellee does not travel outside of Texas for work.

{¶32}   On cross-examination, appellee also testified that appellant knew that he was coming to Ohio in 2010 but that she did not know that he was planning on taking Esther back to Texas with him because he himself did not know at the time. He stated that he told appellant the day that he took Esther and denied that appellant had made trips to Houston to try and get Esther back. Appellee stated that he was willing to move back to Ohio if the court told him that he had to do so to get custody of Esther. He admitted that over the last four years, he had seen Esther in Ohio less than ten times but denied that he threatened to take Esther out of the country.

{¶33}   Appellee was questioned about his work arrangements. He testified that if he gained custody of Esther, he would not work nights or weekends.  Appellee indicated that he encouraged appellant's children to have a relationship with her and that he had given appellant money more than the three occasions that appellant claimed.

{¶34} When questioned by the Guardian ad Litem, appellee testified that he decided to seek custody of Esther after he had trouble maintaining a relationship with her over the phone and due to concerns about her school attendance. He also indicated that he was concerned that Esther did not have contact with her sisters. He also stated that he would have come to Ohio more often to visit if he had been able to make arrangements with appellant.

{¶35} On redirect, appellee testified that appellant never called him and let him know when Esther was sick or about any problems that Esther was having. He stated that he had exercised visitation with his daughter every time that the court said that he could. He also testified that he had not had contact with Esther's school because appellant told him not to interfere. Testimony was adduced that both appellant and appellee claimed Esther as a dependent for tax purposes in 2011, even though it was his year to do so.

{¶36} The final witness to testify was the Guardian ad Litem. The Guardian ad Litem testified that appellee had contacted her over the years and indicated that he could not get hold of appellant and that she believed him because she also was unable to get hold of appellant. According to the Guardian ad Litem, appellant would either be late for appointments or miss them altogether. She also testified that Esther's school was unable to get hold of appellant. The Guardian ad Litem voiced her concerns that Esther was unable to maintain contact with her father and over Esther's school attendance. According to the Guardian ad Litem, Angela and Matthew did not have parental guidance while in appellant's home and appellant was in trouble for not making sure that they attended school. She further noted that appellant had failed to attend a

meeting with the school about Esther's attendance issues and that appellant was alienated from her other daughters. She indicated that she had made recommendations for appellant to obtain counseling, but did not believe that appellant had one so.  The Guardian ad Litem recommended that appellee receive custody because he was more willing to follow court orders and would  allow appellant to have access to Esther while, if appellant had custody, appellant would not promote Esther's relationship with her father.

{¶37}   On cross-examination, the Guardian ad Litem testified that she believed that Esther made friends easily and was going to be starting first grade, so she would be able to adjust to a new environment. She also noted that appellee's stepchildren turned to him rather than appellant, their mother, in times of crisis and that she had not seen appellant's new home or any proof of her new job.

{¶38}   After the trial, both parties filed Closing Arguments and Proposed Findings of Fact and Conclusions of Law. The trial court, pursuant to a Judgment Entry filed on October 3, 2012, ordered that appellee be designated Esther's  custodian and residential parent and that appellant be granted parenting time.

{¶39}   Appellant now raises the following assignments of error on appeal:

{¶40}   WHETHER  THE JUDGMENT OF THE TRIAL COURT WAS AN ABUSE OF DISCRETION.

{¶41}   WHETHER  THE JUDGMENT OF THE TRIAL COURT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

I, II

{¶42} Appellant, in her two assignments of error, argues that the trial court abused its discretion in granting custody of Esther to appellee and that the decision was against the manifest weight of the evidence.

{¶43} As an initial matter, we note that appellant, in the body of her argument, alleges that appellee did not file the affidavit required by R.C. 3109.04(M). Such section provides as follows: "(M) The court shall require each parent of a child to file an affidavit attesting as to whether the parent, and the members of the parent's household, have been convicted of or pleaded guilty to any of the offenses identified in divisions (C) and (F)(1)(h) of this section" However, appellant did not raise this issue as an assignment of error. See, for example, *Carr v. Kaiser*, 3rd Dist No. 4-11-11, 2012-Ohio- 2688, paragraph 34, fn. 4. Moreover, at the trial, appellee, as noted by appellant, testified that, during his first marriage, his former wife had lied and told the police that appellee had thrown a baby against a wall and that he was taken to jail. He further testified that he was granted bail on the condition that he report to the police once a week and not return home. Such information, therefore, was before the trial court and appellant was not prejudiced by the lack of an affidavit.

{¶44} Because custody issues are some of the most difficult and agonizing decisions a trial judge must make, he or she must have wide latitude in considering all the evidence and such decision must not be reversed absent an abuse of discretion. *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159 (Citation omitted). "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140

(1983). In *Bechtol v. Bechtol,* 49 Ohio St.3d 21, 550 N.E.2d 178 (1990) the Ohio Supreme Court held: "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *Id.* at syllabus. The reason for this standard of review "is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis,* supra at 418. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984).

{¶45} R.C. 2151.23(F)(1) directs that a juvenile court shall exercise its jurisdiction in child custody matters in accordance with, inter alia, R.C. Section 3109.04. In determining the best interest of a child in custody matter, the court is to consider all relevant factors, including, but not limited to those set forth under R.C. 3109.04(F)(1). However, there is no requirement that a trial court separately address each factor enumerated in R.C. 3109.04(F)(1). *In re Henthorn,* 7th Dist. No. 00–BA–37, 2001–Ohio–3459. Absent evidence to the contrary, an appellate court will presume the trial court considered all of the relevant "best interest" factors listed in R.C. 3109.04(F)(1). *Id.,* citing *Evans v. Evans* , 106 Ohio App.3d 673, 677, 666 N.E.2d 1176 (12th Dist. 1995).

{¶46} In allocating parental rights and responsibilities, the trial court must consider the best interest of the child or children. R.C. 3109.04(F)(1) sets forth the factors a trial court must consider when making such a determination, and reads, in pertinent part:

{¶47} "In determining the best interest of a child pursuant to this section, * * *, the court shall consider all relevant factors, including, but not limited to: (a) The wishes of the child's parents regarding the child's care; (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court; (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) The child's adjustment to the child's home, school, and community; (e) The mental and physical health of all persons involved in the situation; (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; * * * (i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; (j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."

{¶48} Upon our review of the evidence, we cannot say that the trial court abused its discretion in awarding custody of Esther to appellee. The trial court's decision was not arbitrary, unconscionable or unreasonable. As is set forth in detail in the statement of facts, there was testimony that appellant's children, including Esther, had serious

issues with school attendance and that appellee, the Guardian ad Litem and Esther's school had trouble getting hold of appellant . In addition, there was testimony that appellant had thwarted appellee's attempts to contact and/or visit with his daughter and prevented Esther from seeing her siblings.  While the Guardian ad Litem, in an earlier report, had recommended that custody be granted to appellant, over time, she changed her mind due to concerns about Esther's school attendance and appellant's unwillingness to facilitate a relationship between Esther and appellee. Testimony also was adduced that appellee, the Guardian ad Litem, and Esther's school all had difficulty getting hold o appellant and that appellant sometimes missed appointments.

{¶49}  Based on the foregoing, appellant's two assignments of error are overruled.

{¶50}  Accordingly, the judgment of the Delaware County Court of Common Pleas, Juvenile Division, is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Delaney, J. concur.

_____
HON. CRAIG R. BALDWIN

_____
HON. WILLIAM B. HOFFMAN

_____
HON. PATRICIA A. DELANEY

CRB/dr

[Cite as *Bashale v. Quaicoe*, 2013-Ohio-3101.]

IN THE COURT OF APPEALS FOR DELAWARE COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| PAULINE BANKESHA BASHALE | : | |
| | : | |
| Plaintiff - Appellant | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| FRANCIS B. QUAICOE | : | |
| | : | |
| Defendant - Appellee | : | CASE NO. 12 CAF 10 0075 |

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Delaware County, Ohio is affirmed. Costs assessed to appellant.

_____
HON. CRAIG R. BALDWIN

_____
HON. WILLIAM B. HOFFMAN

_____
HON. PATRICIA A. DELANEY